**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X     **Docket No.: 23-CV-08685 (MKV)**
D.C. KEENAN & ASSOCIATES

                 Petitioners,

     -against-

CHARLES WISELL and LISPSIG SHAPEY
MANUS & MOVERMAN, P.C.

                 Respondents.
------------------------------------------------------------X

---

### MEMORANDUM OF LAW IN OPPOSITION TO PETITION TO CONFIRM ARBITRATION AWARD AND IN SUPPORT OF RESPONDENTS' CROSS-MOTION TO VACATE AND/OR MODIFY THE ARBITRATION AWARD

---

**POLLACK, POLLAC, ISAAC & DeCICCO, LLP**
**Attorneys for Respondents**
**Charles Wisell and Lipsig Shapey**
**Manus & Moverman, P.C.**
**250 Broadway, Suite 600**
**New York, New York 10007**
**Tel: 212-233-8100**

**Brian J. Isaac, Esq.**
**Kenneth J. Gorman, Esq.**
**Of Counsel**

# TABLE OF CONTENTS

Table of Authorities ....................................................................................................... ii

Preliminary Statement........................................................................................................ 1

Factual And Procedural Background ...................................................................................... 2

The Hearing........................................................................................................................ 3

Testimony of Mindy Bish..................................................................................................... 5

Testimony of Charles Wisell ................................................................................................ 8

Arbitrator's award............................................................................................................... 13

Argument............................................................................................................................ 14

Point I:

the award should be vacated as the arbitrator had no jurisdiction
over Lipsig, Shapey, Manus & Moverman, p.c., who were
not signatories to the arbitration agreement and not a party
to the arbitration proceedings ............................................................................................... 13

Point II:

In the alternative, the award should be vacated, as it
violates the Lipsig firm's due process rights given that
it was not a party to the arbitration proceedings
.................................................................................................................................... 17

POINT III:

The award must be vacated because it
Was arbitrary, irrational and
Legally impossible to enforce ............................................................................................... 18

POINT IV:

The arbitration award should be vacated
As a partner does not have the authority to
Bind the partnership to arbitrate a claim
And in any event, DC Keenan waived
Its right to compel the Lipsig firm to arbitrate......................................................................... 20

Point V:

In the event this Court declines to vacate the ward,
It must  be modified, insofar as it pertains to Wisell,
By  reducing it from $268,028.02 to $134,014.01,
Reflecting 10% of Wisell's fee,  as per the agreement
and arbitrator's award ........................................................................................................... 21


Conclusion ........................................................................................................................... 24

# TABLE OF AUTHORITIES

93 CIV. 6313 (SS),

1994 WL 132141 (SDNY Apr. 12, 1994) .................................................................. 20

All Metro Health Care Services, Inc. v. Edwards,

25 Misc. 3d 863 (Sup 2009) ........................................................................................ 22

Allstate Ins. Co. v. Howell,

151 AD3d 461  (1st Dep't 2017) ................................................................................ 22

Am. Renaissance Lines, Inc. v. Saxis S.S. Co.,

502 F.2d 674 (2d Cir. 1974) ....................................................................................... 12

Application of Jevremov,

129 AD2d 174 (1st Dept 1987) ................................................................................... 19

Arboleda v.White Glove Enter. Corp,

179 A.D.3d 632 (2d Dep't 2020) ................................................................................ 13

AT&T Techs. v. Communs. Workers of Am.,

475 U.S. 643 (1986) .................................................................................................... 13

Campbell v. Liberty Transfer Co.,

No. CV-02-3084, 2005 U.S. Dist. LEXIS 45567 (E.D.N.Y. Aug. 19, 2005) ........................ 15, 16

Council of School Sup's and Adm'rs v. New York City Dept. of Educ.,

87 AD3d 883 (1st Dep't 2011) .................................................................................... 17

First Am. Bulk Carrier Corp. v. Van Ommeren Shipping (USA) LLC,

540 F. Supp. 2d 483 (S.D.N.Y. 2008) ........................................................................ 13

Goldman Bros. v. Bldg. Serv. Emps. Int'l Union,

8 Misc. 2d 653  (Sup. Ct., Kings Cty., 1957) ....................................................... 16, 17

Gongora v. New York City Dept. of Educ.,

98 AD3d 888 (1st Dep't 2012) .................................................................................... 18

Gvozdenovic v. United Air Lines, Inc.,

933 F.2d 1100 (2d Cir.1991) ...................................................................................... 20

In re Arbitration between Promotora de Navegacion, S.A.,

131 F Supp 2d 412 (SDNY 2000) .............................................................................. 20

John Wiley & Sons, Inc. v. Livingston,

376 U.S. 543 (1964) .................................................................................................... 13

Litton Fin. Printing Div. v. NLRB,

501 U.S. 190 (1991)................................................................................... 13

Marracino v Alexander,

73 AD3d 22 (4th Dep't 2010)...................................................................... 16

McMahan & Co. (Dunn Newfund I,

230 AD2d 1 (1st Dep't 1997)...................................................................... 16

Meyer v. Uber Techs., Inc.,

868 F.3d 66 (2d Cir. 2017).......................................................................... 13

Mionis v Bank Julius Baer & Co., Ltd.,

301 AD2d 104 (1st Dept 2002).................................................................... 19

Miss Universe L.P. v. Monnin,

952 F. Supp. 2d 591 (S.D.N.Y. 2013) ........................................................ 15

Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Stucco Sys., LLC,

289 F. Supp. 3d 457 (S.D.N.Y. 2018) ........................................................ 13

NYKCool A.B. v. Pac. Fruit, Inc.,

2012 U.S. Dist. LEXIS 52690 (S.D.N.Y. Apr. 16, 2012).......................... 15

Opuoru v. City of New York Admin. for Children's Services,

100 AD3d 422 (1st Dep't 2012).................................................................. 18

Orion Shipping & Trading Co. v. E. States Petroleum Corp.,

312 F.2d 299 (2d Cir. 1963).................................................................. 14, 15

Polito v. New York City Dept. of Educ.,

104 AD3d 604 (1st Dep't 2013).................................................................. 18

Sweeney v. Herman Management, Inc.,

85 AD2d 34 (1st Dept. 1982)...................................................................... 17

Waldman v. Mosdos Bobov, Inc.,

72 AD3d 983  (2d Dep't 2010).................................................................... 22

Zenith Radio Corp. v. Hazeltine Research, Inc.,

395 U.S. 100  (1969)................................................................................... 16

Statutes

Labor Law §  240(1) ............................................................................................ 3, 9

New York State Labor Law §§ 240-241 .................................................................. 1

Partnership Law § 20(3)(e) .............................................................................. 19, 20

Rules

CPLR 7511(b)(1)(iii) ............................................................................................ 14

CPLR § 5501(c) ..................................................................................................... 4

Other Authorities

4B N.Y.Prac., Com. Litig. in New York State Courts § 69:14 (4th ed.  October 2023 update)... 22

5 N.Y. Jur. 2d Arbitration and Award § 230 ..................................................... 17, 18

5 N.Y. Jur.  2d Arbitration and Award § 227 ......................................................... 17

23 Carmody-Wait 2d § 141:31 ............................................................................. 19

Williston on Contracts § 57:19 ............................................................................. 20

## PRELIMINARY STATEMENT

Respondents Charles Wisell ("Wisell") and Lipsig Shapey Manus & Moverman, PC ("Lipsig") (collectively "respondents") submit this memorandum of law in opposition to peitioner's motion to confirm the arbitration award and support of their cross-motion to vacate the arbitration award on the ground that the arbitrator exceeded his authority. Lipsig is not a signatory to the arbitration agreement and there is no basis to name it as a party to this proceeding as it did not participate in the underlying arbitration, which involved Wisell and D.C. Keenan & Associates ("Keenan") only. As such, any award against Lipsig is plainly improper and it should not have been named as a respondent in this proceeding.

With respect to Wisell, while he did execute a consulting agreement with Keenan individually, the latter wholly failed to adhere to the terms of the consulting agreement requiring Wisell to terminate the agreement for cause. At best for petitioner, because the consulting agreement obligated Wisell to pay Keenan a percentage of *his fee only*, which was 50% of the standard one-third contingency fee applicable to personal injury actions in New York, the award should be modified, reducing the required payment from $268,028.02 to $134,014.01.

## FACTUAL AND PROCEDURAL BACKGROUND

On April 15, 2019, Wisell, through his law firm, and Lipsig, commenced the underlying personal injury action entitled <u>Vidal v. JRC Management, LLC. et al.</u>, in Supreme Court, Queens County, Index No. 706681/2019 (the "Vidal Matter"). Mr. Vidal suffered various serious and life-altering injuries after being struck by a falling object and electrocuted while he was working on a construction site in New York City. The claims brought were for negligence and violation of New York State Labor Law §240 and §241, the Industrial Code, and OSHA regulations (**Exhibit 38**, Respondent's Closing Statement).

On or about December 4, 2019, Wisell alone entered into a Consult Contingent Fee Agreement ("Agreement") with Keenan (Petitioner's Exhibit A). The Agreement required petitioner to perform specific, particularized services in connection with the Vidal Matter. Pursuant to the Agreement, petitioner would receive 30% of any recovery by Wisell in the Vidal Matter in exchange for performance of the following:

> "early focus groups, assistance in the rules, codes, bumper sticker, input on witness preparation and deposition hit list, in put on ADR strategy and consultation throughout trial including guidance on opening statements, voir dire, direct examination of witnesses to include medical and ex pert witnesses at trial, preparation of client and witnesses for deposition and trial, closing arguments, and demonstrative evidence."

(Petitioner's Exhibit A, p. 1).

On July 13, 2022, Wisell terminated the agreement for cause. Wisell advised that he and Mr. Keenan had "not had a single conversation regarding Mr. Vidal or his case," and he had not entered into the agreement with Ms. Bish, an employee of petitioner, who is not admitted in the State of New York (**Exhibit 38**, Closing Statement, pp. 2, 4). The underlying personal injury action was resolved on or about January 25, 2023 through the efforts of respondents alone (Doc. No. 1, Petition, ¶15). Because Keenan breached its agreement with Wisell because the former did nothing whatsoever to contribute to the settlement or prosecution of the action, a dispute arose concerning the fee distribution (id., at 16). Despite Wisell's efforts to resolve the dispute amicably, petitioner demanded arbitration (**Exhibit 37**, Respondent's Arbitration Statement, pp. 2, 4).

Pursuant the agreement's "Dispute" provision, the parties to the arbitration appointed the Honorable David B. Saxe (retired) to act as Arbitrator (Doc. No. 1, Petition, ¶17). The hearing was held on June 22, 2023 at the offices of Morrison Cohen, LLP in New York, New York (Doc. No. 1, Petition, ¶21).

**The Hearing**

Prior to taking testimony, Justice Saxe clarified that Keenan was seeking 30% of Wisell's fee (**Exhibit 36**, Transcript, p. 14). In response, Mindy Bish, managing partner at DC Keenan stated "[t]hat is correct 30 percent of his fee" (**Exhibit 36**, Transcript, p. 14). However, Ms. Mish argued that by "his fee", she meant "the Lipsig Law Firm" (**Exhibit 36**, Transcript, p. 15). At this juncture, Justice Saxe pointed out that "Charles Wisell's name is printed in there and then it says" "Attorney" "of the Lipsig Firm" (id). Justice Saxe further noted that the agreement stated, "30 percent of all attorney's fees received by the attorney" and that "Charles Wisell is defined as the attorney" (**Exhibit 36**, Transcript, p. 16).

In addition, Justice Saxe stated that there was "apparently an agreement between Mr. Wisell and the Lipsig Firm, participation agreement, that the Lipsig Firm gets half the fee …and Wisell gets half the fee. So according to that calculation, you would be -- your claim then would be 30 percent of the fee that Mr. Wisell gets" (**Exhibit 36**, Transcript, p. 17). Yet, Ms. Bish persisted in claiming that Wisell "handwrote in that he was signing it on behalf of the entire firm" (**Exhibit 36**, Transcript, p. 18).

Although the Lipsig firm did not sign the agreement, was never served with a notice of intention to arbitrate and was not a party to the arbitration proceeding, Justice Saxe asked Ms. Bish if she was "banking on the fact that he signed it on behalf of the Lipsig Firm to carry your argument", to which she replied in the affirmative (**Exhibit 36**, Transcript, p. 18). In response, Justice Saxe correctly pointed out that Ms. Bish "drafted the agreement, it's your agreement" and therefore, "it has to be construed against your interests" (id).

**Mindy Bish**

Mindy Bish, the managing partner at the Keenan firm, testified that that she never reviewed the complaint in the underlying personal injury action because "[y]ou don't win on a complaint"

(**Exhibit 36**, Transcript, pp. 19, 28). Although the underlying personal injury action involved violations of Labor Law §240(1) and §241(6), Ms. Bish admitted that she had never dealt with a Labor Law case before (**Exhibit 36**, Transcript, p. 29).

While Ms. Bish claimed that Mr. Wisell provided her with "a summary of the law in New York on these kinds of cases", she had no independent knowledge about Labor Law § 240(1). She did not even know what was required to establish liability under §240(1) (**Exhibit 36**, Transcript, p. 30). Ms. Bish claimed that "damages are really my job. Building…a damage case" (**Exhibit 36**, Transcript, pp. 30-31).

Although Labor Law §240(1) was a strict liability statute, Ms. Bish stated that she advised Wisell not to move for summary judgment on the issue of liability (**Exhibit 36**, Transcript, pp. 31-32). She claimed her decision would be based on focus groups and to determine which group would get angrier in order to maximize the verdict (**Exhibit 36**, Transcript, p. 32). Justice Saxe pointed out that by not moving for summary judgment as to liability under §240(1), she ran the risk of getting an adverse liability verdict (**Exhibit 36**, Transcript, p. 33).

Justice Saxe could not understand why Mrs. Bish "would…eschew summary judgment" (**Exhibit 36**, Transcript, p. 37). Ms. Bish stated that settling the Vidal Matter for $8 million was not enough and that "if you do it right, a jury is going to give you 20. That's why" (id). Justice Saxe, pointing out Ms. Bish's complete ignorance of New York practice regarding sustainable pain and suffering awards under CPLR §5501(c), correctly pointed out that "you would have run up against people like me in the Appellate Division who would have cut you" (**Exhibit 36**, Transcript, p. 38).

Justice Saxe stated that what he was "troubled by is this idea of balancing summary judgment as against going to trial…I mean, I have had a lot of the best lawyers in New York in

my day when I was a trial judge come before me. And I don't know any of them that would not, when summary judgment was for the asking, not go for it. I don't know any of them. And I know the top plaintiff's lawyers in New York" (**Exhibit 36**, Transcript, p. 122).

When questioned on what particular services Keenan provided for the Vidal Matter, Ms. Bish was unable to point to anything substantive. She only discussed Keenan's general processes admitting she did not review pleadings, discovery, scheduling orders, or other case documents (**Exhibit 36**, Transcript, pp. 78, 100-101). Ms. Bish claimed that she was familiar with NYSCEF, but that it was Wisell's responsibility was "send me the things" (**Exhibit 36**, Transcript, p. 101). While Ms. Bish claimed that Keenan prepared the client for his deposition, she never spoke with Mr. Vidal (**Exhibit 36**, Transcript, p. 51); she merely provided some guidance to Tracy Weinstein, Wisell's former associate regarding plaintiff's deposition (id.).

When asked what substantive work she did on the Vidal Matter, Ms. Bish stated that Wisell attended courses over a 3-day period where she taught him "HIT LIST" or case winning hits, that "you utilize at defendant's deposition" (**Exhibit 36**, Transcript, p. 102). Yet, she conceded that she never reviewed plaintiff's deposition transcript or plaintiff's motion for partial summary judgment as to liability prior to it being filed (**Exhibit 36**, Transcript, pp. 51, 116). When asked if Keenan provided "any particularized advice or assistance that was specific to the Vidal case", Ms. Bish stated, "[j]ust generalized participation in video events. Nothing specifically one-on-one with me dealing with this case" (**Exhibit 36**, Transcript, pp. 169-170).

Ms. Bish maintained that the Agreement was to be fulfilled through Keenan's training sessions (**Exhibit 36**, Transcript, p. 71). When asked why Mr. Keenen was never available to speak with Wisell, Ms. Bish stated "[h]e was only unavailable to Mr. Wisell because Mr. Wisell refused to give him what he needed to analyze so that he could have a productive call. They were not

friends. He was a referring attorney" (**Exhibit 36**, Transcript, pp. 152-153). She claimed that "In order for Mr. Keenan to provide that information to him, he needed certain information to go before a focus group because that's how Mr. Keenan tries a case" (**Exhibit 36**, Transcript, p. 153).

Ms. Bish was forced to concede that Mr. Keenan's heath issues prevented him from being able to practice law. According to the medical history that Mr. Keenan circulated after Wisell fired Keenan for cause, he stated, "First my memory is shot, I don't remember from minute-to-minute what day it is. Cannot recall dates, times. Anything with figures" (**Exhibit 36**, Transcript, p. 153). Ms. Bish testified that Mr. Keenan "is almost 70 and he has Parkinson's. So part of his therapy is coming to terms with his deficits and learning how you overcome them to lead a productive life. He would like to try a case again. So, he is doing the work to be able to go into a courtroom and try a case again" (**Exhibit 36**, Transcript, pp. 153-154).

When asked when Wisell first asked to speak directly to Mr. Keenan regarding the Vidal Matter, Ms. Bish stated, "he was sending e-mails…indicating that he wanted to be treated special. Different than everyone else in the group. And that he wanted to chat with Mr. Keenan on the phone" (**Exhibit 36**, Transcript, p. 111). She further claimed that although "Keenan is why people come to the Keenan Law Institute," most of the people in her groups are "pretty satisfied with what I do because they know it comes from Mr. Keenan. But Charles had decided that he wanted to be special" (id.).

Ms. Bish was presented with an email from Wisell dated March 12, 2021 where he stated "Mindy, I always have my cellphone should someone want to talk about things. I would like to discuss my case directly with Mr. Keenan too. We never had a single conversation about the case. We should start there. I believe that in the fall and early winter Mr. Keenan was going to call me" (**Exhibit 36**, Transcript, p. 126). Ms. Bish stated that "Mr. Keenan didn't respond because I already

told him that Mr. Keenan doesn't do phone calls; he only does videoconferences" (id). However, when Ms. Bish conceded that Mr. Keenan does respond to emails, she stated, "he does not continually respond to this stuff. He expects me to handle it" (id).

By email dated February 4, 2022, Wisell sent Ms. Bish the following email:

"I made an agreement to work on this case with Mr. Keenan. My Note of Issue has been filed, all discovery is complete and motions for summary judgment are fully briefed, argued and submitted. I have spent countless hours on this case. You cannot possibly imagine how much time I have spent working this case. At no point have I ever spoken with Don (Mr. Keenan) about the case and I have asked many, many times. Now you want me to summarize everything I did and spoon feed it to you so you can catch up. No thanks.

Moreover, I do not appreciate your combativeness with me when all I've asked for is to talk with the lawyer I wanted to work with.

You can do the video PP and the opening etc. as your contribution to the case. I work with referring attorneys daily and have never treated one as you have treated me.

I look forward to speaking with Mr. Keenan. I need no further response from you at this time."

(**Exhibit 27**, Email)

In response to this email, Ms. Bish told Wisell that in order to have a phone call with Mr. Keenan, he needed to provide "three things from you: One; the completed client biography. Two; a PowerPoint put together by your office showing the HITS you got in the depositions you took. And three; a recorded opening" (**Exhibit 36**, Transcript, pp. 132-133). Ms. Bish stated that "Mr. Keenan refuse[d] to speak to Mr. Wisell without that information" because "[h]e does not shoot the breeze" (**Exhibit 36**, Transcript, p. 133). Ms. Bish claimed that Mr. Keenen failed to respond to subsequent emails as well on this ground (**Exhibit 36**, Transcript, pp. 134-135).

In response, Ms. Bish stated that Wisell told her to write the opening PowerPoint herself and that he would show her the depositions (**Exhibit 36**, Transcript, p. 134). Ms. Bish

acknowledged receiving the deposition transcripts and a rough draft of his opening. "But basically he was telling me to -- do the work" (id). Ms. Bish stated that she "elected not to have him join us via Zoom to discuss his recollection of what work he did on the case" (**Exhibit 36**, Transcript, p. 154). She claimed that she did not need Mr. Keenan because she had "videos and documents. And I would rather hear it from your client's mouth than Mr. Keenan's mouth" (id.).

**Charles Wisell**

Wisell testified he signed the agreement seeking to work directly with Don Keenan based on Keenan's reputation and advertised expertise (**Exhibit 36**, Transcript, p. 157). When Wisell took seminars with Keenan, they would lure you in, claiming that "if you ever refer a case to us, we have a secret sauce" (**Exhibit 36**, Transcript, p. 160). However, "there is no secret sauce. There is nothing like it…I got…lured in, thinking there was going to be something and it was smoke and mirrors" (**Exhibit 36**, Transcript, p. 161).

Wisell stated that he "really wanted to work with Don Keenan…I didn't want to work with Mindy Bish…signed up to work with Don Keenan. That's what I wanted" (**Exhibit 36**, Transcript, p. 161). When Justice Saxe inquired as to why he did not put this in the contract, Wisell explained "I signed up the contract they provided me", but acknowledged that "in hindsight, I made a mistake. I should have" (id.).

When Wisell signed the Agreement, he was employed by Lipsig (**Exhibit 36**, Transcript, p. 162). The Vidal Matter came from Wisell, as he had formerly represented Mr. Vidal's in-law who was happy with the results (id). Wisell had an agreement with Lipsig, agreeing to split the attorneys' fee in half with the firm (**Exhibit 36**, Transcript, pp. 162-163).

Wisell explained that contrary to what Ms. Bish testified to, the Vidal Matter, which settled for $8.25 million, was "not undersettled", that this was "a terrific number" and that "the client

wanted us to settle the case for much less because he had significant financial needs" (**Exhibit 36**, Transcript, p. 168). Mr. Keenan never provided Wisell "with input on witness preparation in the Vidal case" (**Exhibit 36**, Transcript, p. 169). He never spoke to Wisell "about the deposition HIT LIST" (id.).

Moreover, Mr. Keenan never corresponded with Wisell regarding "alternative dispute resolution strategy on the Vidal case" (**Exhibit 36**, Transcript, p. 169). From the time the Agreement was signed, neither Mr. Keenan nor any of his associates spoke to any witnesses (id.). Mr. Keenan never provided guidance on medical and expert witnesses at trial (id). When asked if Keenan provided any particularized advice or assistance specific to the Vidal Matter, Wisell stated, "Just required generalized participation in video events. Nothing specifically one-on-one with me dealing with this case" (**Exhibit 36**, Transcript, pp. 169-170).

While Ms. Bish claimed she requested a series of documents from Wisell before being permitted to speak with Mr. Keenan, this was not required under the Agreement (**Exhibit 36**, Transcript, p. 170). Ms. Bish, who blocked Wisell from speaking with Mr. Keenan, had no working knowledge of New York practice in State courts (**Exhibit 36**, Transcript, p. 171). For instance, when the court directed that plaintiff be produced for an EBT, Ms. Bish told him that he could not "produce the plaintiff until you take the defendant's deposition" (id.).

Wisell informed her that in New York, "[u]nder the CPLR, the priority of the deposition is the plaintiff is produced first" (**Exhibit 36**, Transcript, p. 171). When Ms. Bish demanded to see case law on this point, Wisell informed her that it was "the CPLR. It's New York process" (id.). Thus, Wisell "prepped the plaintiff with my associate completely" with "no input whatsoever from Mindy Bish" (id.).

As this was a perfect liability case, Wisell stated that "if I had opted not to move for summary judgment, I probably would have had to put my malpractice carrier on notice" (**Exhibit 36**, Transcript, p. 178). Given the complexities of Labor Law §240(1) and §241(6)'s imposition of strict liability on owners and general contractors, juries generally had a difficulty with regard to finding them at fault when they had nothing to do with a plaintiff's accident. Wisell explained that "there is a huge risk with trying a labor-law case in New York State" (**Exhibit 36**, Transcript, pp. 177-178). "This was a case that you could lose in front of a jury" (**Exhibit 36**, Transcript, p. 179).

Although Wisell expected Keenan "to add some value to the case", he stated that by the time he "got to summary judgment, I realized they had no idea what they were doing and there was nothing helpful coming from them" (**Exhibit 36**, Transcript, p. 180). There was nothing of value that Keenan could add "[a]nd the advice they had given me was all bad advice", such as advising not to take the plaintiff's deposition despite the fact that the court ordered it and the CPLR required it (id.).

Moreover, Ms. Bish was insistent that Wisell not move for summary judgment because Mr. Keenan says "[y]ou want to get all the facts in front of the jury" despite the fact that Mr. Vidal had a perfect liability case under Labor Law §240(1) and §241(6) (**Exhibit 36**, Transcript, p. 180). Keenan "had nothing to do with the preparation" for the mediation and did not participate in the mediation (**Exhibit 36**, Transcript, p. 182). Keenan provided no assistance in obtaining the result (**Exhibit 36**, Transcript, p. 186).

The fee Agreement required Wisell to take seminars hosted by Keenan. Wisell explained that it was "a generalized training of the way Don Keenan…liked to follow" (**Exhibit 36**, Transcript, pp. 186-187). However, the seminars had nothing directly to do with the Vidal Matter (**Exhibit 36**, Transcript, p. 187).

At the very least, Wisell "thought…I was going to sit down and work through things with Don Keenan, and I get to work with someone who had a little bit of a name recognition. His name would never be on anything, but he would work with me and maybe there was something I could gain from that" (**Exhibit 36**, Transcript, p. 187). Wisell explained that he wanted to speak to Mr. Keenan directly because he "didn't sign up with him to work with lawyers that weren't doing anything for me" (**Exhibit 36**, Transcript, p. 192).

Wisell stated that the series of emails entered into evidence showing that he repeatedly attempted to contact Mr. Keenan were not responded to (**Exhibit 36**, Transcript, pp. 192-193). Ms. Bish stipulated that "Mr. Keenan had me reply to Charles when he e-mailed" and that Keenan "did no work after we were terminated" (**Exhibit 36**, Transcript, p. 193).

In July 2022, Wisell terminated his agreement with Keenan because "[t]hey hadn't performed at all. I had no communication with Don specific to this" (**Exhibit 36**, Transcript, pp. 193-194). Wisell stated that he did not "get what I signed up for. I didn't sign up to work with, with…David Hoey [and Mindy Bish]" as there was nothing they could teach him (**Exhibit 36**, Transcript, p. 194).

Wisell subsequently discovered that Mr. Keenan was suffering from Parkinson's Disease in May 2023 when he received an email from William Entrekin, an affiliate of Keenan, with an attachment detailing Mr. Keenan's medical history (**Exhibit 36**, Transcript, p. 195). This email "titled, Keenan Medical History" stated in pertinent part:

> "My entire life I have been plagued by high blood pressure, and it almost kept me out of the Marine Corps, but I've managed it by medication and exercise. Thereafter, I contracted Type 2 diabetes, which never really got under control, either by medication or food. Then these conditions, together with a head injury three years ago, set in motion the development of Parkinson's disease, which is documented to be caused by trauma and other medical condition. It took the Mayo almost seven months, and countless tests to finally zero in on a multiform of disease.

All came to a head as I was taking Teresa to a scheduled rheumatology appointment, and it had me on the brink of a bad seizure, to which my primary doctor told me to go to the nearest emergency room quickly. This was the 15th of February, and unfortunately waited nine and a half hours in the emergency department but was attended to during that period. Thereafter, I was admitted to the emergency room, but their beds were full, so spent two days on the acute care floor, until a bed came about in the ICU on 16 February. I stayed in the ICU for a period of 3 weeks during which time, I was given multiple medications, and three surgeries.

\*    \*    \*

I was told by the surgeon and team that it was touch-and-go, and but for my exercise regime and prayers things would have turned out not so good.

\*    \*    \*

For obvious reasons, I had to maintain radio silence to everyone other than my partners, Mindy, Gregg, and David who rose to the occasion, took over important matters, and exceeded expectations.

\*    \*    \*

In addition to the memory problems, I also continued not to be able to see out of my right eye, which occurred right after the fall three years ago. And the vestibular problem persists. I'm able to use a wheelchair, and occasionally use a cane, and thank goodness the house has been accommodating in terms of an elevator and padded furniture and a pool"

(**Exhibit 31**, Email; **Exhibit 36**, Transcript, pp. 196-197, 198).

Wisell testified that he was never told about Mr. Keenan's medial issues prior to May 2023. "Nobody said that to me, that Mr. Keenan was sick and what would you like to do. I didn't get any responses from anybody" (**Exhibit 36**, Transcript, pp. 197-198).

Wisell did not believe that "Keenan & Associates provide[d] any services that were specific to aiding the Vidal case, and actually aided the Vidal case" (**Exhibit 36**, Transcript, p. 199). "Mindy Bish had no understanding of what it's like to litigate this case in New York. And she still doesn't" (id.).

**Arbitrator's Award**

On August 9, 2023, the Arbitrator issued the Award. The Award found Wisell was obligated to remit to Keenan $268,028.02, which the arbitrator stated was 10% of the legal fee received by Lipsig, though it was not a party to the Agreement, in connection with <u>Vidal v. JRC Management, et. al.</u>, Supreme Court of New York, Queens County Index Number 706681/2019 (Petitioner's **Exhibit C**, 8/9/23 Arbitration Decision).

As Lipsig was not a signatory to the Agreement, was not served with a notice to arbitrate and was not a party to the arbitration proceedings, respondents cross-move to vacate the award on the ground that the arbitrator did not have the authority to remit 10% of the legal fee received by Lipsig as the attorney of record in Vidal to Keenan. Moreover, the award is irrational as Lipsig split the fee with Wisell and thus, 10% of Lipsig's fee is $134,014.01. The Agreement only authorized the arbitrator to make an award based on the fee Wisell received in the case. As to Wisell, in the event the Court declines to vacate the award, the record establishes that Keenan materially breached the consulting agreement by non-performance such that, at most, the arbitration award should be reduced from $268,028.02 to $134,014.01, 10% of Wisell's fee.

## ARGUMENT

### POINT I

**THE AWARD SHOULD BE VACATED AS THE ARBITRATOR HAD NO JURISDICTION OVER LIPSIG WHO WAS NOT A SIGNATORY TO THE ARBITRATION AGREEMENT, WAS NOT SERVED WITH A NOTICE TO ARBITRATE AND WAS NOT A PARTY TO THE ARBITRATION PROCEEDINGS**

An arbitrator has no jurisdiction over a non-signatory to an arbitration agreement absent a determination by a court, not the arbitrator itself, as to whether any claim against the non-signatory should be arbitrated. Indeed, it is well established under the FAA and New York law that "arbitrators do not have the power to bind a party" who is "not a party to the arbitration contract

13

or a voluntary participant in the arbitration proceeding." <u>American Renaissance Lines, Inc. v. Saxis S.S. Co.</u>, 502 F.2d 674, 677 [2d Cir. 1974] [finding alleged alter egos of respondent were not bound by arbitration award or arbitrator's jurisdiction where they were neither parties to the arbitration agreement nor the arbitration proceedings].

This is because "arbitration is a matter of contract" and "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration." <u>AT&T Techs. v. Communs. Workers of Am.</u>, 475 U.S. 643, 648-49 [1986]. As explained in <u>AT&T</u>, the "threshold question" in this situation is "whether the court or an arbitrator should decide if arbitration provisions in a [contract]…. bind the surviving corporation" and the answer is "no doubt that this question was for the courts." Id. (citing, <u>John Wiley & Sons, Inc. v. Livingston</u>, 376 U.S. 543 [1964]).

Accordingly, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." Id. (underlining added). Accord, <u>Arboleda v. White Glove Enter. Corp</u>, 179 AD3d 632 [2d Dept. 2020]. This latter point reflects the settled principle that "a party cannot be forced to arbitrate the arbitrability question." <u>Litton Fin. Printing Div. v. NLRB</u>, 501 U.S. 190, 208-209 [1991]. A court's determination as to arbitrability of claims against a non-signatory is therefore a prerequisite to any jurisdiction of an arbitrator over that non-signatory. See, e.g., <u>Meyer v. Uber Techs., Inc.</u>, 868 F.3d 66, 73 [2d Cir. 2017] ["…before an agreement to arbitrate can be enforced, the district court must first determine whether such agreement exists between the parties."].

The Southern District consistently applies this principal to prohibit extension of an arbitrator's jurisdiction to non-signatories – absent an initial judicial determination of arbitrability. See, e.g., <u>First Am. Bulk Carrier Corp. v. Van Ommeren Shipping (USA) LLC</u>, 540 F. Supp. 2d

483, 485 [SDNY 2008] [holding that it was for the court to decide whether non-signatory defendant, contested as a successor-in-interest to a non-party signatory, could compel arbitration against a signatory plaintiff "prior to the arbitration hearing" because "there is much to be said for determining who are the parties to the arbitration before the arbitrators hear the merits"]; Nat'l Union Fire Ins. Co. v. Stucco Sys., LLC, 289 F. Supp. 3d 457, 466 [SDNY 2018] [holding that "whether [the non-signatory successor] is to be a party to the [arbitration agreement] is an issue for judicial determination first" and rejecting argument that question should be determined by arbitrator, explaining that to do so "puts the proverbial cart- [i.e.] the question of whether the arbitration agreement is valid - before the horse- [i.e.] whether a non-signatory has anything to do with a contract it did not clearly sign"].

Thus, respondents respectfully submit that the arbitrator improperly exerted jurisdiction and authority over Lipsig as non-signatories to the Agreement despite the fact that it neither signed it nor were parties to the arbitration proceedings. This overstepping of power by an arbitrator requires vacatur of the award under both New York law and the FAA. Compare FAA §10(a)(4) and CPLR 7511(b)(1)(iii). A wealth of authority has uniformly held that precisely the exercise of jurisdiction at issue here over non-signatories represents an abuse of authority that mandates vacatur.

A leading case on this issue is Orion Shipping & Trading Co. v. Eastern States Petroleum Corp., 312 F.2d 299, 300-301 [2d Cir. 1963], which vacated an award against an alleged successor under substantively the same circumstances as those at issue here, determining that an award against a non-party successor was subject to vacatur as exceeding the powers of the arbitrator, explaining: "the arbitrator exceed[s] his powers in determining the obligations of [the successor]

corporation which was clearly not a party to the arbitration proceeding" and therefore determining its request "to vacate the award against [it] should be granted." Id.

New York courts have often explicitly cited the <u>Orion</u> holding for the same proposition at issue here, namely, that an award against a non-party successor is invalid and subject to vacatur absent an initial determination of arbitrability against the non-party successor. A straightforward example of such a holding is <u>Fiat S.p.A. v. Ministry of Finance & Planning</u>, 1989 U.S. Dist. LEXIS 11995, at *14 [SDNY 1989], succinctly explaining its application to the facts of this case as follows:

> the arbitration proceeding was not the proper forum for deciding whether an arbitrator may afford relief against a non-signatory who is not covered by an arbitration agreement [citing Orion, 312 F.2d at 301]. The proper forum would have been before the Court on a motion to compel arbitration. This Court vacates the award as against [the non-signatory] because the determination as to whether to afford relief against [the non-signatory], a non- party to the arbitration clause, was not the arbitrator's to make.

Id. Accord, <u>NYKCool A.B. v. Pac. Fruit, Inc.</u>, 2012 U.S. Dist. LEXIS 52690, at *17-18 [SDNY 2012] ["where an alleged successor or alter ego is not a named party in a proceeding, the claimant must bring a separate action in which those other entities are named defendants in order to pierce the corporate veil and find alter ego and/or successor liability"] (quotation omitted).

## POINT II

## IN THE ALTERNATIVE, THE AWARD SHOULD BE VACATED, AS IT VIOLATES LIPSIG'S DUE PROCESS RIGHTS

Assuming arguendo that the Arbitrator possessed jurisdiction over Lipsig (which it did not), the award should be vacated as it violates the firm's due process rights. It is well settled that "all parties to [an arbitration] proceeding are… entitled to notice and an opportunity to be heard". <u>Miss Universe L.P. v. Monnin</u>, 952 F. Supp. 2d 591, 603 [SDNY 2013]. The opportunity to be heard includes rights to not only service with initiating process notifying a party of claims asserted

against it as a party [see, e.g., <u>Campbell v. Liberty Transfer Co.</u>, 2005 U.S. Dist. LEXIS 45567, at *7 [EDNY 2005]], but also an opportunity to "present evidence and cross-examine witnesses" which may not be waived. <u>Marracino v. Alexander</u>, 73 AD3d 22, 26 [4th Dept. 2010] [in arbitration, the due-process requirements ensure "the participants' right to be heard, present evidence and cross-examine witnesses [and] may [only] be waived by written consent of the parties or by continuing with the arbitration without objection"].

It is universally recognized under New York law and the FAA that failure to comply with any of these due-process standards constitutes a "fundamental unfairness" requiring "vacatur of an arbitration award." <u>McMahan & Co. v. Dunn Newfund I, Ltd.</u>, 230 AD2d 1, 4 [1st Dept. 1997]. In <u>Zenith Radio Corp. v. Hazeltine Research</u>, 395 US 100 [1969], the Supreme Court declined to enforce a judgment against a corporation that was found by the trial court to be the "alter ego" of a defendant corporation which was not named as a party to the action nor served with process as a party. As the Court explained, "a judgment cannot be enforced against an alleged alter ego who has not had an opportunity to litigate whether or not such a relationship did exist." Id. at 110; see also, <u>Campbell</u>, <u>supra</u>, 2005 U.S. Dist. LEXIS 45567, at *7 [while a successor or alter ego "may be called upon to answer for its debts [that] does not eliminate the need for the purported [successor/alter-ego] to be served with Notice and provided with an opportunity to be heard before being directed by a court to make payment"].

The undisputed facts of this case demonstrate that these minimum due-process requirements were completely disregarded. In <u>Goldman Bros. v. Building Service Employees International Union</u>, 8 Misc.2d 653, 654 [Sup. Ct., Kings County 1957], an employer sought to vacate an award that had been entered against it in an arbitration proceeding in which the employer was unnamed until the very end of the proceeding at the arbitration hearing when the petitioner

made an ex-parte motion to amend the notice of claim to include the previously unnamed employer. The court found that "the amendment, at the arbitration hearing, of the notice of arbitration, without notice thereof given to the employer, constituted misbehavior which warrants setting aside the award." (Goldman Bros., supra, at 654). The same result is plainly required here.

As Lipsig was not a signatory to the Agreement and not a party to the arbitration, the award should be vacated.

**POINT III**

**THE AWARD MUST BE VACATED BECAUSE IT WAS ARBITRARY, IRRATIONAL AND LEGALLY IMPOSSIBLE TO COMPLY WITH**

"An arbitration award may be vacated if it is wholly irrational, such as where the arbitrator gives a completely irrational construction to the provisions of the parties' agreement, thereby effectively rewriting it; engages in a perverse rather than merely egregious misconstruction of the governing terms of the agreement; or renders an award which would be violative of public policy if enforced" (5 N.Y. Jur. 2d Arbitration and Award §230 (citations omitted)). In addition, an arbitration award must be vacated "if it leaves the parties unable to determine their rights and obligations, it does not resolve the controversy submitted, or it creates a new controversy" (5 N.Y. Jur. 2d Arbitration and Award §227 (citations omitted).

"Where the arbitrator takes a contract with arguable terms and, by ignoring and misinterpreting some facts and adding new ones, creates nonexistent legal duties and an entirely new contract with different obligations, the award is completely irrational and should be vacated.

Further, an award is irrational where it…directs another party to exercise legal authority it does not possess, or where it defies common sense or shocks the court's sense of fairness" (5 N.Y. Jur. 2d Arbitration, supra, at §230, citing, Sweeney v. Herman Management, Inc., 85 AD2d 34 [1st Dept. 1982]; Matter of Council of School Supervisors & Adm'rs, Local 1 v. New York City Dept.

of Educ., 87 AD3d 883 [1st Dept. 2011]; Matter of Polito v. New York City Dept. of Educ., 104

AD3d 604 [1st Dept. 2013]; Matter of Gongora v. New York City Dept. of Educ., 98 AD3d 888

[1st Dept. 2012]; Opuoru v. City of New York Admin. for Children's Servs., 100 AD3d 422 [1st

Dept. 2012]).

It is uncontested that Wisell and Lipsig had an agreement to split the attorneys' fee 50-50

and Lipsig was not a signatory to the Agreement. Yet, the award states that Wisell "is obligated to

remit to [DC Keenan] ten percent (10%) of the total amount received, as a legal fee, by the Lipsig

Law Firm" (Petitioner's Exhibit C, 8/9/23 Arbitration Decision). As Wisell does not have the legal

authority to force Lipsig to pay any portion of its attorney's fee to Keenan, the award must be

vacated given that "it defies common sense [and]/or shocks the court's sense of fairness". 5 N.Y.

Jur. 2d Arbitration, supra, at §230, citing, inter alia, Matter of Polito, supra; Matter of Gongora,

supra).

Moreover, the award, which requires Wisell to pay Keenan 10% of Lipsig attorney's fee is

utterly irrational given that the attorneys' fee, which was $2,680,280.20[1], was split 50-50 between

Wisell and Lipsig. Thus, the award, aside from being unenforceable, must be vacated as it requires

Wisell to pay 20% of the Lipsig firm's fee, which has no basis in law or fact.

**POINT IV**

**THE ARBITRATION AWARD SHOULD BE VACATED AS A PARTNER DOES NOT
HAVE THE AUTHORITY TO BIND THE PARTNERSHIP TO ARBITRATE A CLAIM
AND IN ANY EVENT, KEENAN WAIVED ITS RIGHT TO COMPEL LIPSIG TO
ARBITRATE**

"The Partnership Law provides that unless authorized by the other partners or unless the

other partners have abandoned the business, one or more but less than all of the partners have no

---

[1] Justice Saxe notes at fn.1 of the final ward that "Petitioner overpaid its fees to the Arbitrator in the sum of $4,221.98 and Respondent underpaid its fees to the Arbitrator in same amount. Thus, this amount includes a reduction due from Petitioner to Respondent in the sum of $4,221.98."

authority to submit a partnership claim or liability to arbitration". 23 Carmody-Wait 2d §141:31, citing, Partnership Law §20(3)(e). Thus, aside from the fact that Lipsig was not served with a notice to arbitration and was not a party to the arbitration, Wisell did not have the authority to bind Lipsig to the Agreement, as all members of Lipsig were not signatories to the agreement.

In <u>Jevremov v. Crisci</u>, 129 AD2d 174 [1ˢᵗ Dept. 1987], the individual signed a contract containing an arbitration clause in his capacity as president of a corporation only, and did not sign in his individual capacity, although a separate space for so signing was provided. The Supreme Court denied the president of corporation's motion to permanently stay the arbitration against him in his individual capacity. In reversing the order, the Appellate Division, First Department held that individual who signed contract containing an arbitration clause in his capacity as president of corporation only and did not sign in his individual capacity. could not be compelled to arbitrate (<u>Mionis v. Bank Julius Baer & Co.</u>, 301 AD2d 104 [1ˢᵗ Dept. 2002]).

In the instant matter, as Wisell executed the Agreement in his individual capacity and because there was no indication that the Lipsig firm was a party to it, or ratified it any way, the award should be vacated as utterly irrational and in violation of Partnership Law §20(3)(e).

### POINT V

### IN THE EVENT THIS COURT DECLINES TO VACATE THE AWARD, IT MUST BE MODIFIED INSOFAR AS IT PERTAINS TO WISELL, BY REDUCING IT FROM $268,028.02 TO $134,014.01, REFLECTING 10% OF WISELL'S FEE, AS PER THE AGREEMENT AND ARBITRATOR'S AWARD

Given that Lipsig was not a signatory to the Agreement, and not a party to the proceeding, any award against it is definitionally improper. "Third persons who are not parties to an arbitration agreement generally are not bound by the agreement or any resulting award. It is beyond the power of the parties in their agreement of submission to prevent the exercise of a right of action by those who are not parties to the agreement" (Williston on Contracts §57:19).

A non-signatory to an arbitration clause may be bound by an arbitral award if in the course of the arbitration proceeding, or in its dealings with parties to the arbitration, its conduct demonstrates an intent to arbitrate the submitted dispute. See, <u>Promotora de Navegacion, S.A. v. Sea Containers, Ltd.</u>, 131 F.Supp. 2d 412, 419 [SDNY 2000], citing, <u>Gvozdenovic v. United Air Lines, Inc.</u>, 933 F.2d 1100, 1105 [2d Cir. 1991]; <u>Chios Charm Shipping Co. v Rionda</u>, 1994 U.S. Dist. LEXIS 4571 [SDNY 1994]. Here, there is no indication that Lipsig, which had a separate agreement with Wisell, ever demonstrated an intent to arbitrate this attorney fee dispute. This is logical, given that it was never served with a notice of intent to arbitrate, and Keenan never moved to compel it to arbitrate.

As noted above, Ms. Bish testified that under the Agreement, Keenan is entitled to 30% of the contingency fee received by Wisell in the Vidal Matter. She confirmed that the agreement allows Keenan to recover 30% of all attorney's fees received by the "Attorney", which is defined in the agreement as Wisell. When Justice Saxe sought to clarify that Keenan was only claiming 30% of Wisell's fee, not the full 33% from the original contingency agreement, Ms. Bish confirmed that Keenan's share was 30% of the amount that Wisell himself receives in attorney's fees. It was further noted that the Agreement defines Wisell as the "Attorney", further indicating the 30% fee discussed was intended to be calculated based on Wisell's personal attorney fees.

As Justice Saxe correctly held that any ambiguities in a contract must be construed against the drafter, which was Keenan, and because Lipsig was not a party to the arbitration proceedings, the award, at the very least, must be modified to reflect that Keenan is awarded 10% of Wisell's attorneys' fee.

It is respectfully submitted that even this amount is a windfall for Keenan, who did not honor its commitments under the Agreement. While Wisell entered into the Agreement with the

intention of working with Mr. Keenan, Keenan never disclosed that Mr. Keenan was afflicted with Parkinson's Disease, which prevented him from being able to do any work.

Not only was this a clear misrepresentation, which was compounded by Mr. Keenan's refusal to answer any of Wisell's emails and refusal to return his phone calls, but it explains why the termination letter that Wisell sent to Mr. Keenan was returned as undeliverable (**Exhibit 30**).

Given that the arbitrator's awarded of 10% of Lipsig's fee is $134,014.01 and not $268,028.02, it is respectfully submitted that in the event this Court declines to vacate the award, it should be modified to reflect that it should be 10% of Wisell's fee, which is also $134,014.01.

## CONCLUSION

It is respectfully submitted that the petition should be denied and respondents' cross-petition granted.

**Dated: New York, New York**
       **November 8, 2023**

_____
       **Kenneth J. Gorman, Esq.**